## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RANDALL J. PEDERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  vs.<br><br>MELA SCIENCES, INC., JOSEPH V. GULFO, RICHARD I. STEINHART, AND BREAUX CASTLEMAN,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NO. _____

CLASS ACTION

COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

### OVERVIEW

1. This is a federal class action on behalf of purchasers of the common stock of MELA Sciences, Inc. ("MELA" or "Company") (f/k/a Electro-Optical Sciences, Inc.) between **February 13, 2009 and November 16, 2010,** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). MELA operates as a medical device company that focuses on the design and development of a non-invasive, point-of-care instrument to assist in the early diagnosis of melanoma. As alleged herein, Defendants published a series of materially false and misleading statements that Defendants knew and/or recklessly disregarded were materially false and misleading at the time of publication, and that omitted to reveal material information necessary to make Defendants' statements, in light of such omissions, not materially false and misleading.

2. MELA's flagship product, MelaFind, features a hand-held imaging device that emits multiple wavelengths of light to capture images of suspicious pigmented skin lesions and

extract data. This product uses automatic image analysis and statistical pattern recognition to help identify lesions to be considered for biopsy to rule out melanoma.

3.     The Company noted that it entered into a binding Protocol Agreement with the United States Food and Drug Administration ("FDA"), which is an agreement for the conduct of the pivotal trial in order to establish the safety and effectiveness of MelaFind. The Company noted that the data accrual phase of the MelaFind pivotal trial was completed in the third quarter of 2008 and the image processing classification algorithms were finalized in the fourth quarter.

4.     Nevertheless, throughout the Class Period, Defendants conditioned investors to believe that FDA approval of MelaFind would be forthcoming through a host of materially false and misleading statements regarding the status of MelaFind's ongoing clinical studies, and the safety and efficacy of the Company's products. For instance, on February 13, 2009, Defendants announced *"positive top-line results of its pivotal trial of MelaFind, a non-invasive, point-of-care instrument to assist in the early detection of melanoma, the deadliest form of skin cancer.."*

5.     In touting positive aspects of MelaFind, Defendants were able to, among other things: (a) deceive the investing public regarding the Company's business, operations, management, future business prospects and the intrinsic value of MELA's common stock; (b) deceive the investing public regarding MELA's business and management; (c) deceive the investing public regarding the efficacy of MelaFind and its prospects for FDA approval; (d) enable Defendants to sell almost $79 million of MELA's common stock to the public while in possession of material adverse non-public information about the Company; and (e) cause plaintiff and other members of the Class to purchase MELA common stock at artificially inflated prices.

6.      Finally, on November 16, 2010, however, investors learned the truth concealed by Defendants' Class Period misstatements.  On that date, it was reported, in part, that MelaFind *"could cause harm because of the potential for misdiagnosis,"* and that *"FDA staff pointed to numerous problems with Mela's study of the device, called MelaFind, including a significant lack of data, and urged a new clinical trial."*

7.      On this news, investors were shocked to learn the truth regarding MelaFind.  As a result, MELA's stock price plummeted approximately 46% as the artificial inflation caused by Defendants' material misrepresentations during the Class Period was removed, thereby harming plaintiff and the Class who purchased the Company's shares at artificially inflated prices.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  MELA maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff **RANDALL J. PEDERSON**, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of MELA at artificially inflated prices during the Class Period and was damaged thereby.

13.    Defendant **MELA SCIENCES, INC.** ("MELA") is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 50 South Buckhout Street, Suite 1, Irvington, New York 10533.  The Company was formerly known as Electro-Optical Sciences, Inc. and changed its name to MELA Sciences, Inc. in April 2010.

14.    According to the Company's profile listed on *finance.yahoo.com*, MELA operates as a medical device company that focuses on the design and development of a non-invasive, point-of-care instrument to assist in the early diagnosis of melanoma.   MELA's principal flagship product, MelaFind, features a hand-held imaging device that emits multiple wavelengths of light to capture images of suspicious pigmented skin lesions and extract data.  This product uses automatic image analysis and statistical pattern recognition to help identify lesions to be considered for biopsy to rule out melanoma.  The components of the MelaFind system include: a *hand-held imaging device*, which employs high precision optics and multi-spectral illumination (multiple colors of light including near infra-red); a *proprietary database* of pigmented skin lesions, which we believe to be the largest in the U.S.; and, *lesion classifiers*, which are sophisticated mathematical algorithms that extract lesion feature information and classify lesions.  MELA filed the MelaFind pre-market approval application with the FDA in June 2009.

## Individual Defendants

15.    Defendant **JOSEPH V. GULFO** ("Gulfo") is and was, during the relevant period, President, Chief Executive Officer, and a Director of the Company. During the Class Period,

defendant Gulfo signed and certified the Company's SEC filings, including MELA's Forms 10-Q and 10-K. Also during the Class Period, Defendant Gulfo was also responsible for the registration and sale of almost $79 million of MELA common stock to the investing public, while in possession of material non-public information about the Company.

16.   Defendant **RICHARD I. STEINHART** ("Steinhart") is and was, during the relevant period, Vice-President of Finance, Chief Financial Officer, Treasurer, and Secretary of the Company. During the Class Period, Defendant Steinhart signed and certified the Company's SEC filings, including MELA's Forms 10-Q and 10-K. Also during the Class Period, Defendant Steinhart was also responsible for the registration and sale of almost $79 million of MELA common stock to the investing public, while in possession of material non-public information about the Company.

17.   Defendant **BREAUX CASTLEMAN** ("Castleman") is and was, during the relevant period, Chairman of the Board of Directors of the Company. During the Class Period, Defendant Castleman signed the Company's Forms 10-K. In June 2003, the Company entered into a consulting agreement with Defendant Castleman for consulting services related to the FDA approval of MelaFind, and the Company's business and financial strategy. Under this agreement, Defendant Castleman receives compensation for each month of services rendered. Also during the Class Period, Defendant Castleman was also responsible for the registration and sale of almost $79 million of MELA common stock to the investing public, while in possession of material non-public information about the Company.

18.   The defendants referenced above in ¶¶15-17 are referred to herein as the "Individual Defendants."

5

19.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MELA's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  As a result, the Individual Defendants are liable for the false and misleading statements pleaded herein.

20.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MELA common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme: (a) deceived the investing public regarding the Company's business, operations, management, future business prospects and the intrinsic value of MELA's common stock; (b) deceived the investing public regarding MELA's business and management; (c) deceived the investing public regarding the efficacy of MelaFind and its prospects for FDA approval; (d) enabled Defendants to sell almost $79 million of MELA's common stock to the public while in possession of material adverse non-public information about the Company; and (e) caused plaintiff and other members of the Class to purchase MELA common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of MELA between **February 13, 2009 and November 16, 2010**, inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, MELA common shares were actively traded on the Nasdaq.  As of November 1, 2010, the Company reported that 25,253,136 shares of its common stock were outstanding.  While the exact number of Class Members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MELA or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal securities laws.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of MELA; and,

(c)     to what extent the members of the Class have sustained damages and the proper measure of such damages.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## REGULATORY FRAMEWORK GOVERNING CLINICAL TRIALS

27.     With respect the Company's clinical trials of MELA, Defendants were subject to the following regulations promulgated by the FDA.

### Review of Ongoing Investigations

28.     Concerning review of ongoing investigations, 21 CFR §312.56 provides, in pertinent part:

(a)     The sponsor shall monitor the progress of all clinical investigations being conducted under its IND.

8

\*      \*      \*

(c)     The sponsor shall review and evaluate the evidence relating to the safety and effectiveness of the drug as it is obtained from the investigator. The sponsors shall make such reports to FDA regarding information relevant to the safety of the drug as are required under § 312.32. The sponsor shall make annual reports on the progress of the investigation in accordance with § 312.33.

## Annual Reports

29.     In regard to the submission of annual reports to the FDA, 21 CFR §312.33

provides:

A sponsor shall within 60 days of the anniversary date that the IND went into effect, submit a brief report of the progress of the investigation that includes:

(a) Individual study information. A brief summary of the status of each study in progress and each study completed during the previous year. *The summary is required to include the following information for each study*:

(1) The title of the study (with any appropriate study identifiers such as protocol number), its purpose, a brief statement identifying the patient population, and a statement as to whether the study is completed.

(2) The total number of subjects initially planned for inclusion in the study; the number entered into the study to date, tabulated by age group, gender, and race; the number whose participation in the study was completed as planned; and the number who dropped out of the study for any reason.

*(3) If the study has been completed, or if interim results are known, a brief description of any available study results.*

(b) Summary information. Information obtained during the previous year's clinical and nonclinical investigations, including:

*(1) A narrative or tabular summary showing the most frequent and most serious adverse experiences by body system.*

(2) A summary of all IND safety reports submitted during the past year.

(3) A list of subjects who died during participation in the investigation, with the cause of death for each subject.

(4) A list of subjects who dropped out during the course of the investigation in association with any adverse experience, whether or not thought to be drug related.

*(5) A brief description of what, if anything, was obtained that is pertinent to an understanding of the drug's actions, including, for example, information about dose response, information from controlled trails, and information about bioavailability.*

*(6) A list of the preclinical studies (including animal studies) completed or in progress during the past year and a summary of the major preclinical findings.*

(7) A summary of any significant manufacturing or microbiological changes made during the past year.

(c) A description of the general investigational plan for the coming year to replace that submitted 1 year earlier. The general investigational plan shall contain the information required under § 312.23(a)(3)(iv).

(d) If the investigator brochure has been revised, a description of the revision and a copy of the new brochure.

(e) A description of any significant Phase 1 protocol modifications made during the previous year and not previously reported to the IND in a protocol amendment.

(f) A brief summary of significant foreign marketing developments with the drug during the past year, such as approval of marketing in any country or withdrawal or suspension from marketing in any country.

(g) If desired by the sponsor, a log of any outstanding business with respect to the IND for which the sponsor requests or expects a reply, comment, or meeting.

[Emphasis added].

## SCIENTER ALLEGATIONS

### Defendants' Positions of Authority and Control

30.     As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued

or disseminated to the investing public; and, knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding MELA, their control over the Company's alleged materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning MELA and MelaFind.

31.     Defendants were motivated to materially misrepresent to the SEC and investors the true condition of MELA and the true facts about MelaFind because, in touting positive aspects of MelaFind, Defendants were able to, and did: (a) deceive the investing public regarding the Company's business, operations, management, future business prospects and the intrinsic value of MELA's common stock; (b) deceive the investing public regarding MELA's business, management; (c) deceive the investing public regarding the efficacy of MelaFind and its prospects for FDA approval; (d) enable defendants to sell almost $79 million of MELA's common stock to the public while in possession of material adverse non-public information about the Company; and (e) caused plaintiff and other members of the Class to purchase MELA common stock at artificially inflated prices.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

32.     The Class Period begins on February 13, 2009. On that day, Defendants issued a press release touting positive news about its flagship product, MelaFind. The release stated, in part, the following:

> IRVINGTON, NY (February 13, 2009) – Electro-Optical Sciences, Inc. ("EOS") (NASDAQ: MELA) today *announced positive top-line results of its pivotal trial of MelaFind, a non-invasive, point-of-care instrument to assist in the early detection of melanoma, the deadliest form of skin cancer. The blinded study,*

*conducted at seven centers across the US, included 1,831 pigmented skin lesions from 1,383 patients, making this the largest prospective study ever conducted in melanoma detection.* EOS is working to complete its Pre-Market Approval (PMA) application and expects to file it with the US Food and Drug Administration (FDA) shortly.

*"MelaFind appears to be an excellent tool to help detect melanoma at the earliest, most treatable stage,"* said Gary D. Monheit, MD, Associate Clinical Professor of Dermatology at the University of Alabama in Birmingham and the lead investigator for the MelaFind pivotal trial. "With no cure for late stage melanoma, early detection is our best defense against this cancer, which has reached epidemic proportions."

Prior to the start of the study, EOS and the FDA entered into a binding protocol agreement to stipulate the sensitivity and specificity endpoints that should be used to determine the safety and effectiveness of MelaFind.

*MelaFind detected 112 of 114 (98% sensitivity; lower confidence bound of 95%) melanomas that were eligible and evaluable for primary sensitivity endpoint analysis, and 125 of 127 (98% sensitivity; lower confidence bound greater than 95%) melanomas overall.* The protocol agreement calls for sensitivity endpoints of greater than 95% lower confidence bound.

*MelaFind's specificity, the ability to accurately rule out disease, was significantly superior (9.5%) to that of the study dermatologists (3.7%), who are skin cancer experts (p-value less than 0.02).* The protocol agreement calls for MelaFind to be more specific than the study physicians at a p-value[2] of less than 0.05.

*Almost half of the melanomas in the study were melanoma in situ, the most curable yet most difficult form of melanoma to detect.* [Emphasis added].

33.    On March 2, 2009, the Company filed its Form 10-K for the fiscal year ending December 31, 2008, signed by Defendants Gulfo, Steinhart, and Castleman, and certified by Defendants Gulfo and Steinhart. The 2008 Form 10-K also reiterated many of the statements made in the February 13, 2009 release, including that MelaFind received "positive top line results from the MelaFind pivotal clinical trial." The 2008 Form 10-K further touted results of the MelaFind trial, stating, in part, the following:

To date, MelaFind® has been developed, trained and tested on over 9,000 skin lesions from over 7,000 patients at over 30 clinics. *Our clinical studies have*

*demonstrated that MelaFind® is highly sensitive for melanoma in situ and minimally invasive melanomas, and results in fewer false positive biopsies than skin cancer experts. Furthermore, reader studies have demonstrated that MelaFind® detected more melanomas than dermatologists, including skin cancer experts.*

We believe that with the assistance provided by MelaFind®, physicians could diagnose more melanomas at the earliest, most curable stages with *fewer false positive biopsies,* which would reduce both treatment costs and the number of unnecessary biopsies, and improve quality of life. [Emphases added].

34.   In addition to the foregoing, Defendants also used the 2008 Form 10-K to condition investors to believe that the Company had already complied with the FDA's regulatory framework and had already satisfied certain parameters indicated in the Protocol Agreement with the FDA, including, in part, the following:

In late 2004, we entered into a binding Protocol Agreement with the FDA for our pivotal clinical study. A pivotal clinical trial is a blinded clinical study that is used by the FDA as the basis for determining the effectiveness of a device in a PMA application. The Protocol Agreement specified the inclusion criteria (description of patients and lesions eligible for the trial), sample size, endpoints, and performance criteria necessary to establish the safety and effectiveness of MelaFind®. The Protocol Agreement requires that the study include at least 1,200 pigmented skin lesions and at least 93 eligible melanomas for analysis. *The data accrual phase of the MelaFind® pivotal trial was completed in the third quarter of 2008.* [Emphasis added.]

35.   As stated above, the 2008 Form 10-K also repeated many of the statements contained in the February 13, 2009 release concerning the "top-line" results of its pivotal trial. In addition, however, defendants also included in the 2009 Form 10-K, the following:

In order to generate a comparison with dermatologists' ability to accurately detect melanoma, the Company conducted a parallel pilot readers' study with a different group of 39 dermatologists. *Using images and clinical histories of 23 randomly-selected melanomas from the pivotal study, this group of dermatologists, on average, would have decided to biopsy only approximately 18 (80%) of the melanomas, whereas the MelaFind® result would have led to a biopsy of 22 of the melanomas (biopsy sensitivity of 96%).* [Emphases added].

13

36.     In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously, the 2008 Form 10-K also provided statements concerning the Company's controls and procedures, as follows:

Item 9A. Controls and Procedures.

Evaluation of disclosure controls and procedures

Our company's management, with the participation of our chief executive officer and our chief financial officer, has evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) under the Securities and Exchange Act of 1934) as of December 31, 2008.

Based on such evaluation, our chief executive officer and our chief financial officer have concluded that, as of December 31, 2008, our disclosure controls and procedures were effective to ensure that the information we are required to disclose in reports that we file or submit to the SEC is (1) recorded, processed, summarized and reported within the time periods specified under the rules and forms of the SEC and (2) accumulated and communicated to our management, including our chief executive officer and our chief financial officer, as appropriate to allow timely decisions regarding required disclosures.

37.     In addition to the foregoing, the Company's 2008 Form 10-K also contained certifications by Defendants Gulfo and Steinhart that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

1.      I have reviewed this report on Form 10-K of Electro-Optical Sciences, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles;

c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors  and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operations of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    any fraud whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Joseph V. Gulfo, M.D.
Joseph V. Gulfo, M.D.

President and Chief Executive Officer
(Principal Executive Officer)

Date: March 2, 2009

\*   \*   \*

/s/ Richard I. Steinhart
Richard I. Steinhart
Vice President and Chief Financial Officer
(Principal Accounting and Financial Officer)

Date: March 2, 2009

38.    Defendants Gulfo and Steinhart also certified that the information contained in the

2008 Form 10-K "fairly presents, in all material respects, the financial condition and results of

operations of the Company," as follows:

### CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER
### AND  CHIEF FINANCIAL OFFICER
### PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT
### TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Each of the undersigned officers of Electro-Optical Sciences, Inc. (the
"Company") hereby certifies to his knowledge that the Company's Annual Report
on Form 10-K for the period ended December 31, 2008 (the "Report"), as filed
with the Securities and Exchange Commission on the date hereof, fully complies
with the requirements of Section 13(a) or 15(d), as applicable, of the Securities
Exchange Act of 1934, as amended, and that the information contained in the
Report fairly presents, in all material respects, the financial condition and results
of operations of the Company.

/s/ Joseph V. Gulfo, M.D.
Joseph V. Gulfo, M.D.
President and Chief Executive Officer
(Principal Executive Officer)

March 2, 2009

/s/ Richard I. Steinhart
Richard I. Steinhart
Vice President & Chief Financial Officer
(Principal Accounting and Financial Officer)

March 2, 2009

39.     The statements made by Defendants and contained in the Company's February 13, 2009 release and in the Company's 2008 Form 10-K were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     Defendants failed to disclose that MELAFind's 98 percent accuracy in detecting melanoma skin cancers was enhanced by the fact that all the lesions entered into the study were initially flagged as being possibly cancerous by dermatologists and that this made it easier for the device to accurately diagnose melanoma;

(b)     Defendants failed to disclose that despite the enriched pool of lesions entered into the phase III study, MELAFind still missed three melanomas, accurately diagnosing 172 of 175 lesions;

(c)     Defendants failed to disclose that the Company had no data to prove that MELAFind's sensitivity is greater than that of dermatologists who participated in the study;

(d)     Defendants failed to disclose that MELAFind does not significantly reduce the number of biopsies performed by dermatologists;

(e)     Defendants failed to disclose that the clinical benefit of MELAFind is questionable when borderline lesions (the more difficult-to-diagnose cases) are added to melanomas in the analysis of the phase III data;

(f)     Defendants failed to disclose that MELAFind's biopsy ratio was 7.6 to 1 compared to a biopsy ratio for dermatologists of 7.9 to 1 -- essentially equal;

(g)     Defendants failed to disclose that the Company's clinical studies were defectively designed;

(h)   Defendants failed to disclose that, as a result of the foregoing, FDA approval of MelaFind foreseeably would not be forthcoming;

(i)   Defendants misrepresented the significance of the FDA's concerns as detailed in the Agency's March 19, 2010 series of questions and notification that the MelaFind PMA was not approvable;

(j)   Defendants conditioned the market and investors to believe, until the full truth became known, that MelaFind was foreseeably going to be approved by the FDA in the near term;

(k)   Throughout the Class Period, it was also not true that MELA contained adequate systems of internal operational or financial controls, such that MELA's reported financial statements were true, accurate or reliable; and

(l)   As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim that MELA was operating according to plan, or that MELA could achieve guidance sponsored and/or endorsed by Defendants.

40.   Following the publication of these materially false and misleading statements that had the effect of artificially inflating the price of Company shares, on May 8, 2009, the Company announced that it had received a commitment for an additional $45 million in equity financing. That day, Defendants published a release that stated, in part, the following:

> IRVINGTON, NY, May 08, 2009 (MARKETWIRE via COMTEX) -- Electro-Optical Sciences, Inc. ("EOS") (NASDAQ: MELA) today announced that it has entered into a Committed Equity Financing Facility (CEFF) with Kingsbridge Capital Limited, a private investment group, in which Kingsbridge has committed to provide, at the company's sole discretion, up to $45 million in cash during the next three years, through the purchase of newly-issued shares of Electro-Optical Science's common stock.

"This financing facility provides us great flexibility in choosing if, and when, to access funds, thereby minimizing shareholder dilution. We view this as an important secondary source of capital to that of more traditional equity financings," said Joseph V. Gulfo, MD, President and CEO of Electro-Optical Sciences. "The funds are available to us as we proceed through the regulatory pathway and commercialization process for MelaFind, our non-invasive, point of care, computerized system for early melanoma detection."

\* \* \*

In connection with the CEFF, the company issued a warrant to Kingsbridge to purchase 200,000 shares of common stock at $11.35 per share, representing a 50% premium to the average closing price of the company's common stock for the five days preceding the signing of the CEFF agreement.

The company may access capital under the CEFF by providing Kingsbridge with common stock at discounts ranging from six to ten percent, depending on the average market price of EOS' common stock during the applicable pricing period. The CEFF does not impose any material restrictions on EOS' operating or financial activities. During the term of the CEFF, Kingsbridge is prohibited from engaging in any short selling or derivative transactions related to EOS' common stock.

41.     On May 11, 2009, the Company filed its 1Q:09 Form 10-Q, for the first quarter ended March 31, 2009, signed by Defendants Steinhart, and certified by Defendants Gulfo and Steinhart. Again, the Company's report conditioned investors to believe that MelaFind received "positive top line results from the MelaFind pivotal clinical trial." In addition to the foregoing, the 1Q:09 Form 10-Q again conditioned investors to believe that the Company maintained an adequate system of internal controls, as follows:

Based on their evaluation as of March 31, 2009, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, were sufficiently effective to ensure that the information required to be disclosed by us in this Quarterly Report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules and Form 10-Q, and that such information was accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

42.    The 1Q:09 Form 10-Q again contained Certifications by Defendants Gulfo and Steinhart that continued to certify that the information contained in the 1Q:09 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company," as follows:

### CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER AND  CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Each of the undersigned officers of Electro-Optical Sciences, Inc. (the "Company") hereby certifies to his knowledge that the Company's Annual Report on Form 10-K for the period ended December 31, 2008 (the "Report"), as filed with the Securities and Exchange Commission on the date hereof, fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended, and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Joseph V. Gulfo, M.D.
Joseph V. Gulfo, M.D.
President and Chief Executive Officer
(Principal Executive Officer)

May 11, 2009

/s/ Richard I. Steinhart
Richard I. Steinhart
Vice President & Chief Financial Officer
(Principal Accounting and Financial Officer)

May 11, 2009

43.    On June 4, 2009, Defendants published a release heralding the Company's submission to the FDA of a Pre-Market Approval Application, that again touted the positive results announced by the Company in February 2009.  This release stated, in part, the following:

Electro-Optical Sciences, Inc. ("EOS") (NASDAQ: MELA) today announced the submission to the United States Food and Drug Administration (FDA) of its Premarket Approval (PMA) application for MelaFind®, a non-invasive, point-of-care instrument to assist in the early diagnosis of melanoma, the leading cause of death from skin cancer.

Positive top line data from the MelaFind pivotal study, the largest prospective clinical study ever conducted in melanoma detection, were announced in February and subsequently presented at several major international dermatology meetings in March and May of this year. The company's final analysis of the data demonstrated that for all subgroups analyzed, the sensitivity of MelaFind was greater than 95% (lower confidence bound) and MelaFind specificity was statistically significantly higher than that of study clinicians. As announced previously, the FDA has granted Expedited Review for the MelaFind PMA.

"We believe the final results of the MelaFind pivotal study met the study endpoints and that the pivotal trial satisfied the specifications of the Protocol Agreement with the FDA under which it was conducted," said Joseph V. Gulfo, MD, President & CEO. "We look forward to working with the FDA in the review of the MelaFind application."

44.    The statements made by Defendants and contained in the Company's June 4, 2009 release and those statements contained in the Company's 1Q:09 Form 10-Q were each materially false and misleading when made, and were known by defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein in ¶39, *supra*.

45.    Taking further advantage of the artificial inflation in the price of Company shares caused as a result of Defendants' publication of materially false and misleading information, on or about July 17, 2009, Defendants announced that MELA had registered for sale and sold an additional $15 million of Company stock.  That day, Defendants published a release that stated, in part, the following:

Electro-Optical Sciences Announces $15 Million Registered Direct Offering
IRVINGTON, NY, Jul 17, 2009 (MARKETWIRE via COMTEX) -- Electro-Optical Sciences, Inc. ("EOS") (NASDAQ: MELA), today announced that it has entered into definitive agreements with a select group of institutional investors to sell 2,400,000 shares of common stock at a negotiated purchase price of $6.25 per share in a registered direct offering. The transaction is expected to close on or about July 22, 2009, subject to the satisfaction of customary closing conditions.

The offering will result in gross proceeds of $15 million to EOS, before deducting placement agents' fees and estimated offering expenses. EOS intends to use the net proceeds from the sale of the shares to fund pursuit of its pre-market approval application (PMA) for MelaFind(R), the continued development and, if and when

approved by the U.S. Food and Drug Administration (FDA), the commercialization of MelaFind(R), and for general corporate purposes, including working capital.

All of the shares of common stock are being offered pursuant to a shelf registration statement previously filed with the Securities and Exchange Commission (the "SEC") which was declared effective on July 7, 2008.

46.    On July 24, 2009, the Company filed its 2Q:09 Form 10-Q, for the second quarter ended June 30, 2009, signed by Defendant Steinhart, and certified by Defendants Gulfo and Steinhart.  Again, the Company's report conditioned investors to believe that MelaFind received "positive top line results from the MelaFind pivotal clinical trial," and reminded investors that, "[o]n June 3, 2009, the Company submitted the MelaFind Pre-Market Approval Application to the FDA.

47.    In addition to the foregoing, the 2Q:09 Form 10-Q again conditioned investors to believe that the Company maintained an adequate system of internal controls, as follows:

**ITEM 4.  Controls and Procedures**

**Evaluation of disclosure controls and procedures**

Based on their evaluation as of June 30, 2009, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, were sufficiently effective to ensure that the information required to be disclosed by us in this Quarterly Report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules and Form 10-Q, and that such information was accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

48.    The 2Q:09 Form 10-Q again contained Certifications by Defendants Gulfo and Steinhart that continued to certify that the information contained in the 2Q:09 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the

Company," as follows:

## ELECTRO-OPTICAL SCIENCES, INC.
## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Each of the undersigned officers of Electro-Optical Sciences, Inc. (the "Company") hereby certifies to his knowledge that the Company's quarterly report on Form 10-Q for the period ended June 30, 2009 (the "Report"), as filed with the Securities and Exchange Commission on the date hereof, fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended, and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Joseph V. Gulfo
Joseph V. Gulfo
President and Chief Executive Officer
(Principal Executive Officer)

July 24, 2009

/s/ Richard I. Steinhart
Richard I. Steinhart
Vice President & Chief Financial Officer
(Principal Accounting and Financial Officer)

July 24, 2009

49.    Following the filing of the 2Q:09 Form 10-Q, however, the SEC contacted the Company and complained that defendants had not properly documented their disclosure controls and procedures. In this regard, the SEC informed the Company, in part, as follows:

We note your statement that your chief executive officer and chief financial officer have concluded that your disclosure controls and procedures were "sufficiently effective." It does not appear that your certifying officers have reached a conclusion that your disclosure controls and procedures are *effective*. Please confirm to us that disclosure controls were effective at June 30, 2009 and revise future filings to clearly address your officers' conclusions regarding the effectiveness of you disclosure controls and procedures.

50.    To further condition investors -- and the SEC -- to believe that the Company had

maintained the proper system of internal controls and procedures, on October 7, 2009, Defendants responded to the SEC, in part, as follows:

> The Company confirms that its disclosure controls and procedures were effective at June 30, 2009. We will revise future filings to clearly address our officers' conclusions regarding the effectiveness of our disclosure controls and procedures.

> The Company acknowledges that: (i) the Company is responsible for the adequacy and accuracy of the disclosure in the filing, (ii) Staff comments or changes to disclosure in response to Staff comments do not foreclose the Commission from taking any action with respect to the filing; and (iii) the Company may not assert Staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

51.     The statements made by Defendants and contained in the Company's October 7, 2009 response to the SEC and those statements contained in the Company's 2Q:09 Form 10-Q were each materially false and misleading when made, and were known by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated herein in ¶39, *supra*.

52.     On November 9, 2009, the Company filed its 3Q:09 Form 10-Q, for the third quarter ended September 30, 2009, signed by defendant Steinhart, and certified by Defendants Gulfo and Steinhart.   Again, the Company's report conditioned investors to believe that MelaFind received "positive top line results from the MelaFind pivotal clinical trial," and reminded investors that, "[o]n June 3, 2009, the Company submitted the MelaFind Pre-Market Approval Application to the FDA.

53.     In addition to the foregoing, the 3Q:09 Form 10-Q again conditioned investors to believe that the Company maintained an adequate system of internal controls, as follows:

**ITEM 4.  Controls and Procedures**

**Evaluation of disclosure controls and procedures**